Svare v. SSA                    CV-02-370-B    11/12/03

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW HAMPSHIRE


**Kevin Svare**

    **v.**                                    Civil No. 02-370-B
                                                              Opinion No. 2003 DNH 192

**Jo Anne B. Barnhart,**
**Commissioner, Social Security Administration**


## MEMORANDUM AND ORDER

Kevin Svare filed for Supplemental Security Income benefits ("SSI") on January 19, 2000. His application was denied initially and upon reconsideration. He then requested a hearing before an administrative law judge ("ALJ") which was held on November 14, 2001. After presiding over the hearing at which Svare was represented by a non-attorney, a medical expert, and a vocational expert, the ALJ determined that Svare was not entitled to SSI because he could return to his past relevant work and was therefore not disabled. The Appeals Council then denied Svare's request for review on June 27, 2002.

Pursuant to 42 U.S.C. § 405(g) (2000), Svare seeks judicial review of the Social Security Commissioner's ("Commissioner")

decision denying his 2000 application. Svare argues that the ALJ erred at the fourth step in the Social Security Administration ("SSA") evaluation process by determining that his Residual Functional Capacity ("RFC") allowed him to return to his prior work as an apartment maintenance worker. In particular, Svare complains that the ALJ improperly failed to credit a consulting psychologist's conclusion that Svare suffered from psychological impairments that left him unable to handle the stress and pressure of an entry level job. Svare also complains that the ALJ failed to support his conclusion that Svare's testimony concerning his disability was not entirely credible. (Pet'r Mot. for Order Reversing the Comm'r.) For these reasons Svare moves to reverse the ALJ's decision, while the Commissioner, in turn, moves to affirm. (Def. Mot. for Order Aff. Comm'r.)

## I. BACKGROUND[1]

### A. Education and Work History

Svare was born May 16, 1966, and was 35 at the time of the administrative hearing. He graduated from high school and

---

[1] All background facts come from the parties Joint Statement of Material Facts.

completed two years of college.  Svare has worked as a laborer, apartment maintenance worker, delivery driver, and a packing/maintenance worker.

As an apartment maintenance worker, Svare worked eight-hour days from July 1996 to May 1997.  He was required to maintain and perform repairs on thirteen apartment buildings in a property management firm.  He indicated that he performed small jobs alone, but had assistance with larger jobs.  Svare never had to lift and/or carry objects weighing more than thirty pounds during his employment.

B.    **Medical History**

Svare has limited use of his right middle finger and suffers from varying levels of anxiety, panic attacks, and depression. He has been seen by several doctors for his anxiety, panic attacks, and depression.  Svare was initially evaluated at Lakeland Mental Health Center in January 1990, where he was diagnosed with a somaform disorder, an anxiety disorder, and a personality disorder.  In May of 1992, he was also diagnosed with a narcissistic personality.  Starting on January 12, 2000, however, Svare was given a psychiatric assessment by Christopher Thanel, M.D.  Dr. Thanel's impression was that Svare had a

history of longstanding anxiety, some depressive features, and problems concentrating. The initial diagnosis was panic disorder and depressive disorder NOS (not otherwise specified). (Tr. 341.) Dr. Thanel proposed to first "maximize the benefit of antidepressant treatment," providing improved focus and concentration, enabling Svare to control his anxiety and achieve regular sleep patterns. (Tr. 341-42.) Svare was prescribed Trazodone and had his dosage of Effexor increased.[2]

On March 15, 2000, Svare was seen by Dan Nolte, RNC, at Dr. Thanel's office. Svare complained to Nolte that Effexor provided little improvement. (Tr. 292.) Svare was prescribed a decreasing dosage of Effexor, eventually discontinuing usage, and was prescribed Wellbutrin instead.[3] Nolte noted that Svare's anxiety continued to result in panic attacks, but that such anxiety appeared to be secondary to situational stressors. Id. Nolte found that Svare's sleeping had improved, but that his motivation and energy level were low during the day. Svare's

---

[2] Effexor and Trazodone are used to treat depression. Physicians' Desk Reference (PDR) 3392 (57th ed. 2003); Stedman's Medical Dictionary (Stedman's) 1626 (25th ed. 1990).

[3] Wellbutrin is an antidepressant. PDR, supra note 2, at 1678.

mood was euthymic[4], his insight was fair, and he denied any suicidal ideation, intent, or plan. Svare still complained of a rapid thought process that became worse in the evenings.

Svare returned to Dr. Thanel's office on April 4, 2000, where he was seen by Nolte and Dr. Nancy Torson. (Tr. 291.) Svare complained that his marital difficulties were causing increased anxiety and panic. Id. Svare and his wife, however, noted that Svare's irritability had lessened by approximately 50%. Id. On examination, Svare was found to be less volatile, less depressed, and suffering from a low level anxiety. It was noted that the previous night an emergency room physician had prescribed Svare .25 mg Xanax, to be taken as necessary, for anxiety attacks.[5] Nolte then increased Svare's Wellbutrin and Trazodone dosage, and instructed Svare to use his remaining Xanax for anxiety and panic attacks.

At the next session with Nolte and Dr. Thanel on April 12, 2000, Svare complained that he was still experiencing elevated

_____

[4] Euthymia refers to mental peace or tranquility, not being manic or depressed. Stedman's, supra note 2, at 545.

[5] Xanax is for the management of, or short term relief from, anxiety symptoms. PDR, supra note 2, at 2794.

-5-

anxiety and occasional panic attacks.  He claimed, however that his irritability had vastly improved.  (Tr. 290.)  Svare's major concern at that point was that he did not want to attend employment and job search classes through the county because it made him highly anxious and panicky.  Id.  Nolte noted that Svare had responded well to Wellbutrin for his irritability, but was still experiencing elevated anxiety which caused panic attacks.  Id.  Svare was then taken off Trazodone and Xanax, and prescribed Remeron and Klonopin instead.[6]

Svare was treated for a panic attack on April 13, 2000, at St. Mary's Regional Health Center.  (Tr. 167.)  He was given an intramuscular injection of Ativan[7] and his condition improved.

On April 26, 2000, Svare was seen by Dr. Thanel and Nolte.  Svare reported that he was experiencing less anxiety during the day, was generally not having panic attacks, and was less depressed.  Nolte noted that Svare was sleeping better, his energy and motivation were improved, he was more in control, and

---

[6] Remeron is used to treat depressive disorders.  PDR, supra note 2, at 2401.  Klonopin is used to treat panic disorders.  Id. at 2905.

[7] Ativan is used to help control anxiety disorders.  Id. at 856.

he had a clear focus with respect to his actions.  (Tr. 288.)

Svare underwent Neuropsychological Testing with Patrick J. Konewko, Psy.D., on May 25, 2000, after being referred by his new primary care physician, Dr. Arnett Gaff.  (Tr. 207-09, 254.)  Dr. Konewko found that Svare was responding to Wellbutrin and that Remeron had helped improve his sleep.  (Tr. 208.)  Svare was alert and attentive, a little distressed, and concerned with his attentional and anger management problems.  Id.  Svare told Dr. Konewko that he wanted to make changes in his life because of his longstanding problem in keeping jobs.  Id.  Dr. Konewko chronicled Svare's history of significant substance abuse (marijuana) for over 10 years, alcoholism, and probable learning disability.  The doctor concluded that it was difficult to determine whether Svare's attention problems were due to a bona fide attention deficit disorder.  Id.  The attention problems were nonspecific symptoms and could be associated with generalized anxiety as well as the consequence of prior significant substance abuse.  (Tr. 208-09.)  Dr. Konewko questioned whether Svare's psychiatric symptoms were being adequately controlled by his current medication regime because Svare reported that he had "trouble stopping all of the thoughts

-7-

I have in my mind." Id. The doctor noted that Svare's symptoms needed to be stabilized before a neuropsychologic evaluation could be helpful, and that he would defer a formal neuro-psychological evaluation until he had spoken with Dr. Thanel. Id.

Svare returned to seek treatment from Nolte and Dr. Thanel on November 30, 2000. Nolte noted that Svare had not been seen since May 31 and he had not been taking his prescribed medication for the last several months. (Tr. 287.) Svare's reason for not taking his medication was that he had been working 20 hours per week for a company that made picture frames and could not see Nolte or Dr. Thanel for a follow up visit. Svare reported that his condition worsened once he stopped taking his medication, and that the feelings he currently experienced had previously been relieved by his medication. Id. Svare complained of poor sleep, very low energy and motivation levels, decreased appetite, and increased stress. He also complained of increased irritability focused on his parents and wife, and a fair degree of anxiety and panic. Id. As treatment, Svare was again prescribed Wellbutrin and Remeron and asked to attend a follow-up visit in four to six weeks. Id.

On March 5, 2001, Svare was driven by his parents to a consultative examination with a licensed psychologist, F. Dale Campbell, Ed.S. (Tr. 210-15.) Svare explained that when he had panic attacks, he would get hot and sweaty, would shake, cry, and would occasionally have shortness of breath and a tightening of his chest. Id. He noted that his depressive symptoms were constant, but that his panic attacks depended upon the situation, "sometimes occurring every day and sometimes gone for two or three months." Id. Svare also reported that he had a hard time paying attention to any given task, would lose his concentration, was easily distracted, and that this caused him a lot of anxiety. Id. He told Dr. Campbell that he thought he was born with an anxiety and attention deficit condition, and had been diagnosed with depression in the eighth grade.

When questioned about his interests, Svare indicated that he enjoyed spending time on his computer, walking, and having time with his children. (Tr. 211.) Svare would spend two to three hours per day on a computer he built "from the bottom up." Id. He would also spend Tuesday afternoons and evenings with his two sons, as well as alternate weekends, and when he could visit his parents, his sons would come over because they lived next door.

When Svare spent time with his sons, he explained that they would play games, build things with K-NEX, read, color together, and work on puzzles. He noted he would prepare better meals when his children were there and would sometimes take them to church. Svare also said he walked a quarter mile a day during good weather. Id.

In describing his general routine, Svare said he typically got up between 9:00 and 10:00 a.m. and would then take his medication. If his children were not with him, he would rarely eat breakfast, but would just make coffee and then sit for a while. Id. He would then mope around, listen to music, or get on his computer before taking a nap in the afternoon. His parents would often come over in the afternoon and make him get cleaned up, shower, and shave since Svare would normally not do such things unless he was told. If Svare felt up to it, his parents would then take him out for coffee or shopping. Svare noted he was not good at shopping and hated it, but he could do it by himself. Id. Svare had no weekly schedule other than the visits with his sons. (Tr. 212.)

In regard to household chores, Svare was able to sweep, mop, and do dishes, but his landlord/manager would do the household

repairs and yard work. Svare would wash his clothes at his mother's house with her assistance and go grocery shopping with her help. He indicated that taking care of his sons was the weekly activity that took the most time, persistence, and effort, but because they were his sons, he felt his symptoms interfered the least with this part of his life. Svare believed, however, that energy and disinterest problems affected everything he did. Id.

Dr. Campbell noted that Svare lived in an apartment by himself, that the only structure in his life was the schedule with his sons, and that he appeared to have little trouble adapting to that. When asked how he got along with supervisors, bosses, or social workers, Svare replied that it depended on their attitude. He also stated that he had many friends and that while his mother upset him whenever she criticized him, they got along well.

On mental status exam, Dr. Campbell noted that Svare related adequately, though without much energy, his psychomotor activity, behavior, and eye contact were all average, and his speech and language were clear. (Tr. 213.) When asked about his ability to concentrate while working on his computer, Svare indicated that

-11-

he could stay with simple and easy things and his memory was fair, but he had a hard time concentrating when he was learning "difficult stuff." Id. He stated his only joy in life came from his sons, and that he experienced a lot of hopelessness and suicidal thinking. Id.

Dr. Campbell noted that being around groups of people made Svare uncomfortable. (Tr. 213-14.) His anxiety symptoms were always present, and he had experienced three or four anxiety attacks in the past four months, with the attacks occurring in unusual settings, including his home. (Tr. 214.) Dr. Campbell also noted that the panic attacks Svare described did not appear to be the kind of unexpected event one typically hears described as a panic attack as the attacks involved having a discussion with his sons about their mother and then becoming anxious that they might tell her what he said. Id. After reviewing the mental health professional's descriptions, Dr. Campbell noted there were many references to anxiety and panic, however, they generally seemed to be tied to stressful situations. Id.

Dr. Campbell diagnosed Svare with social phobia, depressive disorder NOS, and dependent personality disorder with some histrionic traits. (Tr. 215.) He concluded that Svare had

adequate mental capacity to understand, remember and follow instructions, however, there would be many instances when his self-concern and anxiety would interfere with his ability to sustain his attention and concentration and would likely interfere with persistence he brought to work-like tasks. Id. Dr. Campbell felt Svare should respond to brief and superficial contact with co-workers, but it was likely there would be instances when he would respond inappropriately or withdraw. Id.

In conducting the examination however, Dr. Campbell noted that Svare seemed "poorly motivated." (Tr. 214.) He also noted that Svare's "ability to tolerate the stress and pressure typically found in an entry-level workplace would be marginal at best." (Tr. 215.)

On March 22, 2001, Svare was again seen by Dr. Thanel. (Tr. 332.) Svare reported being depressed and somewhat socially withdrawn with decreasing energy and motivation. Id. At that point Svare was only taking Clonazepam when necessary for severe anxiety, which he thought was about once a week, and Dr. Thanel advised Svare begin taking Celexa.[8]

_____

[8] Clonazepam is another name for Klonopin and Celexa is used to treat depression. PDR, supra note 2, at 2905, 1344.

-13-

Svare was seen by Howard Winkler, M.D. on May 29, 2001. Dr. Winkler found that Svare appeared to be depressed, was on the verge of tears, had judgement and insight that was somewhat impaired, and had marked anxiety. (Tr. 285.) Svare also complained that he was unable to get Celexa with his Medical Assistance card. Dr. Winkler gave Svare 28 samples of Celexa and prescribed Klonopin.

On September 14, 2001, Svare underwent a psychological evaluation with Kathleen Schara, Psy.D., a licensed psychologist. (Tr. 294-95.) This evaluation was performed upon referral from the Guardian Ad Litem involved in Svare's custody dispute over his two sons. (Tr. 294.) Dr. Schara noted that Svare was asked to complete a test for the evaluation and failed to do so. She observed that Svare appeared disheveled, was inappropriately dressed, and had poor hygiene. She found that Svare's thought content was clear and goal-oriented, his memory was intact for both recent and remote events, his intelligence was within the low average to average range based on vocabulary and presentation, his mood appeared euthymic, he expressed a range of feelings, and he had no suicidal ideation. Id. Svare also completed a symptom checklist which showed a noticeable lack of

-14-

depressive symptomology. (Tr. 295.) The symptoms he did describe were difficulty in paying attention, racing thoughts, feeling his actions were controlled against his will, some cravings, and having difficulty expressing himself or knowing what he was feeling, but only rarely. Id.

Dr. Schara noted that his evaluation was incomplete because of his failure to cooperate with the psychological testing, and that the results were only impressionistic. She felt, however, that Svare suffered from depressive disorder and panic disorder. She also felt Svare had a personality disorder NOS with dependent, schizoid, and self-defeating features, and suffered from severe stressors (divorce process, custody dispute, chronic unemployment). Dr. Schara reported that while Svare presented himself as emotionally well for the evaluation, this was inconsistent with his recent treatment record, suggesting that he may have attempted to "fake good" by minimizing his problems. (Tr. 296.)

Svare has also been treated for his various physical conditions. On February 17, 1999, Svare sought treatment at St. Mary's for chest pain. (Tr. 171.) He was diagnosed with gastritis and possible reflux esophagitis or panic attacks. On

-15-

November 10, 1999, Svare was seen by Aren Graff, M.D., for low back pain.  (Tr. 260.)  Dr. Graff prescribed Naprosyn and Flexeril, and recommended Svare attend physical therapy.[9]

Svare underwent physical therapy for his shoulder between April 3, 2001 and April 19, 2001.  (Tr. 218-25.)  At his last session, Kari Jo Guttormson, MPT, noted that though Svare had some pain with general movements of his knee, his left shoulder range of motion was within functional limits and was almost pain free.  (Tr. 218.)

Svare's records were also evaluated by non-examining physicians.  On June 29, 2000, Cliff Phibbs, M.D., completed a Physical RFC assessment.  (Tr. 180-87.)  Dr. Phibbs found that Svare could frequently lift twenty-five pounds, occasionally lift fifty pounds, and sit, stand and walk for six hours out of an eight hour day.  (Tr. 181.)  The doctor also concluded that Svare had no limitation to his ability to push or pull, but had a limited ability to finger with his right hand and was to avoid extreme heat and cold.  (Tr. 181, 183, 184.)

_____

[9] Flexeril is used as an adjunct to rest and physical therapy for relief of muscle spasms and Naprosyn is used to treat arthritis.  PDR, supra note 2, at 1897, 2891.

Two non-examining psychologists also reviewed Svare's records. George Korgeski, Ph.D., and Thomas Kuhlman, Ph.D., completed Psychiatric Review techniques on Svare dated September 21, 2000 and April 24, 2001, respectively. (Tr. 188-201, 235-48.) Both doctors determined that Svare had moderate difficulty maintaining concentration. (Tr. 198, 245.) Dr. Korgeski also determined Svare had mild restrictions to his daily activities and moderate difficulty maintaining social functioning (Tr. 198), while Dr. Kuhlman found Svare had moderate restrictions of his daily activities and mild to moderate difficulty maintaining social functioning (Tr. 245). Dr. Korgeski noted that Svare had marked limitations in his ability to understand, remember, and carry out detailed instructions, and moderate limitations in his ability to complete a normal work week, interact appropriately with the public, accept instructions and criticism from a supervisor, and respond to changes in the work setting. (Tr. 230-31.) Dr. Korgeski also determined, however, that Svare retained the ability to concentrate on, understand, and remember routine repetitive tasks and three to four-step simple instructions. (Tr. 234.)

-17-

Dr. Kuhlman found that Svare had moderate limitations to his ability to understand, remember, and carry out detailed instructions, maintain attention and concentration, complete a normal work week, interact appropriately with the public and respond to changes in the work setting. (Tr. 226-27.) He indicated that it was unclear if Svare's anxiety and depression had precluded all work from November of 2000 until April of 2001, but that it was unlikely because at the psychological examination in February of 2001, Svare reported that his sleep and other aspects of his mental health condition were improved by medications which he had resumed taking. (Tr. 220.) Dr. Kuhlman concluded that by November 2001, if not before, Svare would be able to learn and remember three to four step instructions, sustain the mental effort for routine and repetitive tasks, and have brief and frequent contact with co-workers, supervisors, and the public. He also noted that Svare, at that time, would not need supervision and would be able to adapt to routine changes and stresses associated with routine, repetitive task work. (Tr. 228.)

C.   **Svare's Testimony**

At the November 14, 2001 hearing, Svare testified that he

had recently worked several jobs. He stated he had worked for a fencing company on a project that lasted three days, worked as a driver for an inner tube company for a couple of weeks until the business closed, and worked at a country music festival for a day until he experienced heat exhaustion. (Tr. 43-45.) He also noted that the longest he had worked at any job was six months. He claimed that his depression and panic attacks prevented him from working, especially when he was attempting to concentrate. For treatment, Svare testified that he was taking Klonopin and Wellbutrin, and was seeing a psychiatrist twice a month. (Tr. 61-63.) As far as his physical limitations, Svare stated he had limited range of motion in his left shoulder and that he could not lift any amount of weight. Svare also noted that he had been living with his parents since June or July, but prior to that had been living by himself in an apartment. (Tr. 52.) While living alone, Svare's family would help him pay bills and remind him of dates and appointments.

## D.    Testimony of Vocational Expert

James Berglie testified before the ALJ as a vocational expert. The ALJ inquired of Mr. Berglie if a man of Svare's age, education, and work experience, who was able to lift fifty pounds

occasionally and twenty-five pounds frequently, but had limited fine manipulation with his right hand, who was to avoid extremes in temperature, was restricted to simple routine three and four-step instructions, and could have only brief and superficial contact with co-workers and the public, would be able to return to his past relevant work. Id. Mr. Berglie responded that a person such as Svare would not be able to perform all of his past laborer jobs because of the exposure to extremes in temperature, but that he could perform assembly positions, maintenance work, and some laborer positions. The ALJ also asked if Svare could return to his past jobs if he was unable to keep a schedule set by others. Mr. Berglie replied that under those circumstances he could not perform either his past work or other jobs that existed in the national economy.

Svare's representative then asked Mr. Berglie if the ability to handle stress was vocationally relevant. Mr. Berglie responded that "if there's, if it's poor or no ability to handle stress that would impact essentially any kind of work. There's no job without stress. There certainly are ones with lesser stress. But again at that level it could potentially preclude work." (Tr. 69.)

-20-

## E.    The ALJ's Decision

The ALJ followed the five step sequential evaluation process established by the SSA in rendering his decision of February 22, 2002.  First, the ALJ found that Svare had not performed substantial gainful activity since his alleged onset date of January 1, 1998.  The ALJ then found that Svare's anxiety disorder, depressive disorder, personality disorder, and right finger condition constituted severe impairments.  Third, the ALJ found that Svare's impairments did not meet or equal the criteria of any listed impairment described in 20 C.F.R., Part 404, Subpart P, App. 1.  At the fourth step however, the ALJ determined that Svare's RFC allowed him to perform a wide range of medium work that included the type of work he had performed in the past.

The ALJ determined that Svare had fine motor limitations in his right hand, was to avoid extreme temperatures, was only to engage in brief and superficial contact with co-workers or the general public, and was limited to following simple instructions and engage in simple, repetitive three or four step tasks.  (Tr. 31, 33.)  The ALJ also found that Svare was capable of lifting and/or carrying fifty pounds on an occasional basis and could

-21-

lift and/or carry twenty five pounds on an occasional basis. Based upon this RFC, the ALJ determined Svare could return to his past relevant work as an apartment maintenance worker.  Id.

The ALJ also considered and rejected the opinion of Dr. Campbell that Svare's ability to tolerate the "stress and pressure typically found in an entry-level workplace would be 'marginal' at best."  (Tr. 30.)  It was determined that the record as a whole did not support this statement and therefore the ALJ assigned very little weight to it.  The ALJ specifically found the record to reflect that Svare had "good parenting skills" and was "able to relate to his sons in a positive manner."  (Tr. 31.)  Svare was able to cook for his sons, play with them, and take them to church.  Svare was also able to "work on the computer for hours at a time", he got along with his mother, his children, and "interact[ed] appropriately with his treating counselors, social workers, and doctors."  Id.  It was the culmination of these factors that led the ALJ to find that Svare's impairments did not cause serious limitations in his ability to tolerate stress commonly found in the typical work environment.  Id.

-22-

The ALJ additionally found Svare's testimony regarding the alleged severity of his impairments to not be entirely credible. The ALJ based this decision on Svare's poor work history, his documented lack of motivation to work, and the inconsistencies and incongruities of Svare's claims with the opinions of the psychologists and treating doctors.

## II.   STANDARD OF REVIEW[10]

Under the Social Security Act, the factual findings of the ALJ are conclusive if supported by "substantial evidence."  42 U.S.C. § 405(g); see also Ortiz v. Sec'y of Health and Human Servs., 955 F.2d 765, 769 (1st Cir. 1991).  I must uphold the ALJ's findings "if a reasonable mind, reviewing the evidence in the record as a whole, could accept [it] as adequate to support [the ALJ's] conclusion."  Rodriquez v. Sec'y of Health and Human Servs., 647 F.2d 218, 222 (1st Cir. 1981).  The ALJ's decision is

---

[10] I apply First Circuit law in resolving this action even though the plaintiff filed his application for benefits in Minnesota which is within the Eighth Circuit.  See Towenson by Mickeal v. Apfel, 16 F. Supp. 2d 1329, 1331 (D. Kan. 1998)(holding that "final decisions of the Commissioner are reviewed under the law of the circuit in which the district court conducting the review is located.").

therefore supported by substantial evidence if, given all the evidence, it is reasonable. It is also the function of the ALJ, and not the courts, to determine issues of credibility, to draw inferences from the record evidence, and to resolve conflicts in the evidence. Ortiz, 955 F.2d at 769.

The ALJ's findings of fact are not conclusive, however, "when derived by ignoring evidence, misapplying the law, or judging matters entrusted to experts." Nguyen v. Chater, 172 F.3d 31, 35 (1st Cir. 1999). If the Commissioner, through the ALJ, has misapplied the law or failed to provide a fair hearing, deference to the Commissioner's decision is not appropriate, and remand for further development of the record may be necessary. See Seavey v. Barnhart, 276 F.3d 1, 11 (1st Cir. 2001). I apply these standards to the arguments Svare raises in his appeal.

### III.  ANALYSIS

Svare argues that the ALJ's ruling that he was capable of returning to his past relevant work was not supported by substantial evidence on the record. He additionally argues that the ALJ failed as a matter of law to adequately explain his decision regarding Svare's credibility. I disagree with Svare on

both points.

## A. The ALJ's Decision is Amply Supported by the Record

At the administrative hearing, the ALJ questioned the vocational expert on the type of work that a person with Svare's abilities, experience, and limitations could perform. The vocational expert excluded some laborer positions because of exposure to temperature extremes, but maintained that a person in Svare's position could return to work as an apartment maintenance worker, an assembly line worker, or even for some laborer positions.

The ALJ listened to the vocational expert's view of how a person with little or no ability to cope with stress might not function in any job. In order for a vocational expert's testimony to be relevant, however, it must be based upon the established medical evidence. Arocho v. Sec'y of Health and Human Servs., 670 F.2d 374 (1st Cir. 1982). Svare's limited ability to handle stress, while mentioned by Dr. Campbell, was not consistent with the evidence on the record as a whole, and the ALJ exercised his discretion in not crediting it as part of the established medical record. See 20 C.F.R. § 404.1527(c)(2) (If any evidence, including medical opinions, are inconsistent

-25-

with the overall record, then the inconsistent evidence will not be controlling, but will be weighed by the ALJ.). The ALJ specifically found that Svare's ability to interact with his children by cooking for them, playing with them, and taking them to church, undercut the notion that Svare could not handle the typical stress of a job. The ALJ also noted that Svare's ability to spend several hours a day on a computer which he built himself, and his ability to interact appropriately with his mother, his children, his doctor, counselors, and social workers, all indicate that his impairments do not seriously limit his ability to tolerate the stress commonly found in a typical work environment. Therefore, the ALJ acted within his discretion by not giving controlling weight to the vocational expert's testimony, based on a statement from Dr. Campbell, regarding a person with little or no ability to handle stress.

Additionally, the ALJ was within his discretion to evaluate Dr. Campbell's opinion regarding Svare's ability to handle stress, and assign the appropriate weight. The ALJ assigned Dr. Campbell's opinion little weight because it did not fit with the established facts on the record as a whole. Svare's ability to hold down a job for over six months while suffering from his

-26-

ailments, his ability to care for his children, and the other factors mentioned above support the ALJ's decision to give Dr. Campbell's opinion little weight. Even if I disagreed with the ALJ's determination of Svare's work capability, which I do not, the ALJ's decision is reasonable given the record as a whole, and I must uphold it as being supported by substantial evidence.

## B.    The ALJ's Credibility Determination Was Appropriate

The ALJ correctly established why he gave little weight to Svare's testimony. The ALJ stated that in addressing the credibility of Svare's allegations, it considered the following factors: objective medical evidence; the nature, location, onset, duration, frequency, radiation, and intensity of any pain; precipitating and aggravating factors; type, dosage, effectiveness, and adverse side-effects of any pain medication; treatment, other than medication for relied of pain; functional restrictions; Svare's daily activities; any measure Svare uses or has used to relieve pain or other symptoms; and Svare's prior work record. (Tr. 29.)

In finding Svare's testimony less than credible, the ALJ specifically cites Svare's poor work history and his documented lack of motivation to work. In this regard, the ALJ notes Dr.

-27-

Campbell's description of Svare as "poorly motivated" and Nolte's remarks that Svare did not want to attend an employment class as examples of his lack of motivation to work. The ALJ also pointed to the inconsistency of Svare's claim to be unable to function because of stress with the reality of his coping well enough to hold a job for over six months, care for his children by cooking for them, playing with them, and taking them to church, building a computer, working on the computer for hours at a time, completing chores around the house, and interacting appropriately with his mother, doctors, counselors, and social workers. (Tr. 30-31.) It also notes that, despite being diagnosed with anxiety and personality disorders back in 1990 and 1992, Svare was able to hold a job as an apartment maintenance worker for over six months. Other than the documented deterioration when Svare stopped taking his medication, the record shows no significant deterioration in Svare's mental disorders since that time to preclude his ability to work in his past relevant occupation.

Given the record as a whole, I cannot find the ALJ's determination on Svare's credibility as unreasonable. Likewise, it is for the ALJ, not the court, to determine credibility. Ortiz, 955 F.2d at 769. Because I find the ALJ's credibility

determination reasonable and explained adequately, I must uphold it.

## CONCLUSION

The ALJ was reasonable and explicit in determining that Svare was capable of returning to his past relevant work and that Svare was not a credible witness. This decision was supported by the record as a whole, and the ALJ did not misapply the law, ignore evidence, or completely disregard the testimony of experts. For these reasons I deny Svare's motion for an order reversing the decision of the Commissioner (Doc. No. 10) and grant the Commissioner's motion for an order affirming the decision of the Commissioner (Doc. No. 12).

SO ORDERED.

_____
Paul Barbadoro
Chief Judge

November 12, 2003

cc:  T. David Plourde, Esq.
     D. Lance Tillinghast, Esq.